Filed 4/2/21  In re Aiden R. CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re Aiden R., a Person Coming Under the Juvenile Court Law. | B307316 (Los Angeles County Super. Ct. No. 18CCJP07532) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>N.R.,<br><br>    Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Debra R. Archuleta, Judge.  Affirmed in part and reversed in part.

Konrad S. Lee, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, Aileen Wong, Deputy County Counsel, for Plaintiff and Respondent.

_____

In this dependency case (Welf. & Inst. Code, § 300 et seq.),[1] N.R. (Father) challenges the sufficiency of the evidence supporting a jurisdictional finding that his missed drug tests placed his child at risk of serious physical harm. He also challenges related components of his case plan. For the reasons explained below, we reverse the jurisdictional finding and the portion of the disposition orders requiring Father to participate in a drug and alcohol program. In all other respects, we affirm the disposition orders.

## BACKGROUND

Father and E.S. (Mother)[2] were in a relationship and they had a son, Aiden, in 2017. Mother also has two minor sons, A.S. and M.H., from a prior relationship. Beginning in or around 2015 and continuing throughout these proceedings, Father was employed full time as a welder.

## I. Prior Dependency Proceedings

In November 2018, when Aiden was one year old, M.H. was seven years old, and A.S. was 11 years old, the Los Angeles County Department of Children and Family Services (DCFS) filed a dependency petition under section 300, subdivisions (a)

_____

[1] Undesignated statutory references are to the Welfare and Institutions Code.

[2] Mother is not a party to this appeal.

2

and (b), alleging Father and Mother's history of engaging in violent verbal and physical altercations in the children's presence placed the children at risk of harm.[3] In January 2019, the juvenile court issued a three-year restraining order protecting Mother from Father, that is set to expire in January 2022. In February 2019, the court sustained the domestic violence allegations against Father and Mother (and A.S. and M.S.'s father). In December 2019, the court modified the restraining order to allow Father and Mother to have peaceful contact to discuss issues related to Aiden, and the court terminated dependency jurisdiction with a family law order awarding Mother sole physical custody and Father and Mother joint legal custody of Aiden.[4]

## II. Current Dependency Proceedings

### A. Referrals and detention

On January 25, 2020, DCFS received a referral after Mother brought two-year-old Aiden to an urgent care center for treatment of a cough and congestion, and the staff believed Mother was under the influence of an illicit drug based on her conduct (slurred and rapid speech, stumbling when she walked, slumped over when she sat, etc.). Father, who did not live with Mother, came to the urgent care center, although the staff did not call him. He did not appear under the influence and his conduct

---

[3] The petition also alleged under section 300, subdivisions (a) and (b) that Mother's history of engaging in violent altercations with A.S. and M.A.'s father placed the children at risk of harm.

[4] The juvenile court also issued a family law order awarding Mother sole physical and legal custody of A.S. and M.A.

was appropriate. The staff released Aiden and eight-year-old M.H. (who accompanied Mother and Aiden to the urgent care center) to Father. DCFS closed the referral against Mother as inconclusive.

On March 18, 2020, DCFS received a referral regarding domestic violence between the children's maternal aunt and her boyfriend. The maternal aunt lived with Mother and the children. When a social worker responded to the home the same day to investigate, it appeared to the social worker that Mother was under the influence of drugs (she "was moving around, she was not making sense, she looked under the influence, she did not make eye contact and she was holding on to the wall").

On March 26, 2020, another social worker responded to the home and interviewed Mother, who denied current illicit drug use but admitted to using methamphetamine and cocaine 10 years before. Mother also stated she took medication for anxiety and depression. Mother told the social worker that Aiden had visitation with Father, but Mother was currently uncomfortable with Aiden attending the visits because of COVID-19. During a follow-up interview with Mother on March 31, 2020, Mother told the social worker that Father "was giving her a hard time" because she would not allow Aiden to visit him because of COVID-19.

The social worker spoke with Mother's therapist on March 31, 2020. The therapist "expressed concern that [Mother] is overmedicating," but the therapist did not have "child safety concerns" regarding Mother. The therapist "reported that she previously had concerns in regards to [Father]." The record does not reveal the nature of those concerns.

On April 1, 2020, Mother reported to the social worker that Father "was calling and leaving 'nasty' messages." Mother forwarded the messages to the social worker. They were profanity-filled messages, in which Father expressed anger at Mother because she would not let him visit Aiden.

The social worker spoke with 12-year-old A.S.'s therapist on April 3, 2020, the same day A.S.'s therapist confronted Mother about whether she was "addicted [to] pills." Mother denied she was addicted to pills, but she told A.S.'s therapist she believed Father was using methamphetamine. As stated in DCFS's April 21, 2020 Detention Report:

"[Mother] disclosed to [A.S.'s] therapist that she believes Aiden's father was possibly abusing methamphetamine. She based these concerns on the fact that in the recent past he left synthetic urine in minor Aiden's overnight bag. [Mother] also said that in the past when he was asked to drug test, he used synthetic urine. Therapist said that [Mother] also shared with her that [Father] has called her a 'pill popping bitch.' This caused the therapist to question the length of time that [Mother] has been abusing pills as she questioned how [Father] would know about this as he had been out of the home for a year."

During an April 7, 2020 interview, the social worker asked Mother if she had any current concerns about Father abusing drugs. Mother responded affirmatively and repeated what she had told A.S.'s therapist, "that in the recent past when [Father] had dropped minor Aiden off, he left a bag of synthetic urine in Aiden's overnight bag." The following day, when the social worker went to Mother's home to inform her that she had tested positive for methamphetamine, the social worker asked Mother if she and Father had used methamphetamine together. Mother

5

stated that "when she met [Father] over twenty years ago, they did use together but had not used together recently." Mother admitted to the social worker that she began using methamphetamine again about two or three months before, after a 10-year hiatus. She also admitted that the children's maternal aunt who lived with her and the children had recently used methamphetamine.

The social worker was unable to reach Father. She left him voice mail messages and texted him on several days between April 1, 2020 and April 9, 2020. Father did not return the messages.

On April 10, 2020, DCFS obtained from the juvenile court an order for the removal of the children. DCFS served it at Mother's home on April 14, 2020. Father and Aiden's paternal grandmother appeared at Mother's home while the social worker was removing the children. The social worker told Father that she had been trying to contact him. The social worker asked Father about Mother's drug use, and Father declined to provide any information. The social worker placed the children in foster care.

Later the same day, the social worker called Father. Initially, he "was very uncooperative," declining to provide information about Mother's drug use. Eventually, he acknowledged he had concerns about Mother's pill use, which he became aware of about a year before. The social worker asked why he did not contact DCFS or respond to the social worker's messages. He responded that "nobody would listen to him." He added, " 'You guys just attacked me.' "

The social worker then asked Father if he had any current or past drug abuse. He replied, " 'This is what I am talking

about. You are trying to screw me.'" The social worker asked if he would drug test, and he said he would, after "he spoke to a Judge." Later in the discussion, Father denied any current or past drug use and agreed to submit to an on demand drug test the next day. He showed for the drug test and the results were negative.

**B.      Dependency petition and detention hearing**

On April 16, 2020, DCFS filed a dependency petition under section 300, subdivision (b), alleging the children were at risk of harm due to Mother's history of substance abuse, including current abuse of amphetamine, methamphetamine, and prescription and over-the-counter medication (count b-1); Mother's history of mental and emotional problems (count b-2); Mother's history of driving the children while under the influence (count b-3); and Mother's decision to allow the children's maternal aunt to live with and have unlimited access to the children although Mother knew the maternal aunt was a methamphetamine user (count b-4). The petition also alleged that Father failed to protect Aiden from Mother's substance abuse (count b-1) and Mother's mental and emotional problems (count b-2).

At the April 21, 2020 detention hearing, Mother submitted to the children's detention and Father requested that the juvenile court release Aiden into his care. Father's counsel stated that Father would agree to unannounced visits, drug testing "upon reasonable suspicion, and any further safety measures that the court would be inclined to order." Father's counsel also explained that Father lived with the children's paternal aunt, which was an added "safety measure." The children's counsel urged the juvenile court to detain Aiden from Father and order monitored

visitation and drug testing for Father "based on his history of drug use and also the mother's suspicion that he may still be using." DCFS's counsel also recommended Aiden's detention from Father.

The juvenile court found DCFS made a prima facie showing that the children were persons described by section 300. The court detained the children from Mother and released Aiden to Father under "the following conditions": (1) that Father was testing clean"; (2) that Father resided with the paternal aunt or in other DCFS approved housing; and (3) that DCFS was to make unannounced home visits. The court ordered monitored visitation for Mother and referrals for weekly, on demand drug and alcohol testing for Mother and Father.

On April 23, 2020, DCFS informed the juvenile court that it received the results from Father's April 15, 2020 drug test, and he tested negative, as set forth above.

### C.     First amended dependency petition

On July 30, 2020, DCFS filed a first amended petition, including all the allegations set forth in the original petition (as summarized above), and adding the following allegations in count b-5:

"[Father] failed to comply with the 04/21/20 Juvenile Court orders. The father was ordered to participate in drug testing. On 05/15/20, 05/18/20, 05/26/20, 05/27/20, 07/06/20, and 07/07/20, the father was a No Show for his drug testing. The father's failure to comply with Court orders[] endangers the child's [Aiden's] physical health and safety and places the child at risk of serious physical harm, damage, danger and failure to protect."

8

## D. Jurisdiction and disposition

A dependency investigator interviewed Father, as summarized in DCFS's August 17, 2020 Jurisdiction/Disposition Report. When the investigator asked Father about Mother's history of methamphetamine and cocaine use as alleged in count b-1 of the original and first amended petitions, Father responded: " 'I don't know about meth. I don't know about drugs.' " He acknowledged he knew that Mother was prescribed pills for anxiety.

When the dependency investigator questioned Father regarding the allegation in the first amended petition about his missed drug tests, Father denied that he missed any tests and denied that he used any illegal substances. DCFS attached to the Jurisdiction/Disposition Record a record showing Father tested negative for drugs on nine occasions between April 15, 2020 and July 24, 2020, and Father missed the five scheduled drug tests that were listed in the first amended petition (as set forth above).[5]

Aiden's paternal aunt, who lived with him and Father, made the following comments, in pertinent part: " 'I live in the same house as Aiden. The baby[6] is very active and hyper. You have to keep an eye on him. Compared to my son[,] he is very

_____

[5] We note that the record DCFS presented shows that Father tested negative for drugs on May 27, 2020, and that he was a "no show" for a drug test on the same date (which is one of the missed tests listed in count b-5 in DCFS's first amended dependency petition).

[6] Aiden was nearly three years old at the time the paternal aunt made these comments.

active.  He is very hyper.  He has a lot of energy. . . .  [Father] takes good care of him.  They are getting more attached because [Father] couldn't see [Aiden] much before.' "

DCFS recommended the juvenile court sustain the first amended petition, remove Aiden from Father's custody, grant Father reunification services, and order monitored visitation between Father and Aiden.  DCFS also recommended Father "be ordered to participate in a substance abuse program if he continues to miss drug tests or test positive."

At the August 17, 2020 adjudication hearing, the juvenile court admitted into evidence DCFS's reports (and exhibits from Mother).  The children's counsel urged the juvenile court to sustain the allegation regarding Mother's history of substance abuse and Father's failure to protect Aiden from Mother's substance abuse (count b-1).  The children's counsel asked the court to dismiss all other allegations in the first amended petition, including the allegation regarding Father's missed drug tests (count b-5).  Regarding the latter allegation, the children's counsel argued:  "Whereas Father did fail to drug test[,] there's no nexus of harm between Father not drug testing and harm to the child.  The child does appear to be well-taken care of [], and there are no concerns based on my independent investigation, as well as the evidence before the court."

Mother asked the juvenile court to dismiss all allegations against her (counts b-1—b-4), and Father urged the court to dismiss all allegations against him (the failure to protect allegations in counts b-1 & b-2, and the missed drug test allegations in count b-5).  Regarding count b-5, Father's counsel argued:

10

"[DCFS] states Father's failure to test places Aiden at substantial risk of harm. However, [DCFS] has failed to show any indication that Father has been under the influence of substances or specifically how Aiden has been placed at risk of harm simply due to Father's missed tests. Father is now testing consistently, I believe, on a weekly basis. Although[] [DCFS] may argue that any missed tests are deemed positive, positive for what drug, Your Honor[?] There are no collateral statements or documentary support offered by [DCFS] to prove my client has been under the influence of any illicit drugs. Although[] Father ha[d] missed tests in the month of May, there may have been some miscommunication with regards to setting Father up because he's testing consistently and regularly for [DCFS].

"And, further, I believe [DCFS] may cite two missed tests on July 6 and 7th, but Father had a test on July 8th, making up that missed test.

"And, additionally, Your Honor, with respect to page 36 of the Jurisdiction Report, [DCFS] states, '[a]dditionally substance abuse may be a problem for Father [R.],' but offers no support in support of this assertion. And Father is residing with the paternal aunt, . . . who was interviewed in the Jurisdiction Report and states that Father takes good care of Aiden, and no concerns were noted.

"So given the lack of sufficient evidence regarding nexus or current risk, I'm asking the court respectfully to dismiss the [b-5] allegation."

DCFS's counsel asked the juvenile court to sustain the first amended petition in its entirety. Regarding count b-5, DCFS's counsel argued: "Father failed to test six times. The release of minor [Aiden] to Father was on condition that he test clean. And

11

a missed test is a dirty test.  So we would ask that that be sustained as well.  [¶]  In addition, [DCFS] at this time is asking that minor be detained from [Father] because of his failure to test and failure to comply with the terms to release to him.”

The juvenile court sustained count b-1 (Mother's history of substance abuse and Father's failure to protect Aiden from Mother's substance abuse) and count b-5 (Father's missed drug tests).  The court dismissed the other counts in the first amended petition.  In sustaining count b-5, the court commented:

“I am going to sustain that [allegation] against [Father] because he was ordered to participate in drug testing by this court on April 21st, and he had multiple failures.  I know that [his counsel] highlighted the time he did appear on July 8th, but prior to that he had approximately six missed tests or no shows.  And that certainly raises a red flag in the court's mind.”

Turning to disposition, DCFS asked the juvenile court to remove the three children from Mother and remove Aiden from Father.  Mother requested that the court release her three children to her custody.  Father requested that Aiden remain in his custody.  Regarding a testing requirement in Father's case plan, Father's counsel stated:  “Father is requesting that, given his negative test results, that he only be tested upon reasonable suspicion.  However, given the court's findings today with regards to sustaining the [b-5] allegation, Father would also be amenable to testing on a regular basis, if the court is so inclined as added protective measure.  But I believe weekly testing at this time has -- Father has cooperated with the weekly testing. We request Father continue to do maybe a set amount of tests, if the court is inclined to order some sort of testing.  Maybe eight consecutive tests.”

12

The children's counsel urged the juvenile court to leave Aiden in Father's custody, and allow shared custody of Aiden for Mother, and place A.S. and M.A. in Mother's custody. Regarding Aiden and Father, the children's counsel stated: "I would be in agreement with Father's attorney that Father -- there is no risk to this child, and [Father] is testing negative. So if the court were to order eight consecutive tests, I believe that would be sufficient in order to ensure this child is safe with [Father] who lives with paternal relatives."

The juvenile court released the children to their parents' custody, commenting: "Mr. R[.] [Father], as far as I'm concerned with you, I'm going out on a limb. I'm not happy with the dirty testing -- or the no testing, more appropriately stated. I'm going to put some conditions on both of these parents because I want them to prove me wrong and show me that they can act responsibly. Otherwise, this court, if this comes back before this court, I will have no alternative but to remove the children if need be, and they can be suitably placed."

The juvenile court ordered Father to participate in "a drug and alcohol program for a minimum of six months" and to submit to random, weekly drug testing. Father's counsel responded: "With respect to the six-month program, Father vehemently objects to this order, as [DCFS] did not recommend this. There have been absolutely zero statements from any collateral [*sic*] indicating that Father has a current substance abuse issue. Father was asked to [test] as a safety measure at the detention hearing, but Father has been testing regularly since June; so for two months and now going on three months, Father has been testing." The court replied: "Your objection, [counsel], is noted for the record. I am putting as much of a safety plan as I can for

13

this family, and more particularly for these children's needs and well-being. So over Father's vehement objection, I am ordering that program as I've indicated previously." The court also ordered Mother to complete a case plan and ordered family preservation services for Mother and Father.

## DISCUSSION

### I.  Justiciability of Father's contention

"When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence." (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.)

In this appeal, Father challenges the sufficiency of the evidence supporting the juvenile court's jurisdictional finding that his missed drug tests placed Aiden at risk of serious physical harm (count b-5). He does not challenge the juvenile court's jurisdictional finding that he failed to protect Aiden from Mother's substance abuse (count b-1), and Mother has not challenged the finding regarding her history of substance abuse either.[7] As Father acknowledges, the juvenile court's jurisdiction over Aiden will continue, whether or not this court reverses the

---

[7] As set forth above, the juvenile court dismissed the allegations in the first amended dependency petition other than counts b-1 and b-5.

14

jurisdictional finding he challenges (b-5), based on the jurisdictional finding that neither he nor Mother challenges (b-1).

Appellate courts may exercise discretion to reach the merits of a parent's challenge to one of multiple jurisdictional findings "in three situations: (1) the jurisdictional finding serves as the basis for dispositional orders that are also challenged on appeal; (2) the finding[] could be prejudicial to the appellant or could impact the current or any future dependency proceedings; and (3) the finding could have consequences for the appellant beyond jurisdiction." (*In re J.C.* (2014) 233 Cal.App.4th 1, 4.) In his opening appellate brief, Father asks this court to exercise its discretion to review the merits of his challenge to jurisdictional finding b-5 regarding his missed drug tests. Because this jurisdictional finding is the basis for a disposition order that Father separately challenges on appeal—the requirement that he participate in a drug and alcohol program for a minimum of six months—we review whether the juvenile court properly made this jurisdictional finding against Father.

## II.    Legal standards for jurisdiction under section 300, subdivision (b) and analysis

Jurisdiction under section 300, subdivision (b), requires proof "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, . . . or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's . . . substance abuse." (§ 300, subd. (b)(1).) It is undisputed that at the time of the adjudication hearing, Aiden had suffered no physical harm or illness. Thus, jurisdiction based on count b-5 required the juvenile court to find

15

by a preponderance of the evidence that there was a substantial risk Aiden would suffer serious physical harm or illness in the future as a result of Father's failure or inability to adequately supervise, protect, or provide regular care for Aiden because of his substance abuse.  (§ 355, subd. (a) ["Proof by a preponderance of evidence must be adduced to support a finding that the minor is a person described by Section 300"].)

In deciding whether there is a substantial risk of serious physical harm or illness, within the meaning of section 300, subdivision (b), courts evaluate the risk that is present at the time of the adjudication hearing.  "While evidence of past conduct may be probative of current conditions, the question under section 300 is whether circumstances *at the time of the hearing* subject the minor to the defined risk of harm."  (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 824, abrogated in part on another ground in *In re R.T.* (2017) 3 Cal.5th 622, 627-629; *In re Yolanda L.* (2017) 7 Cal.App.5th 987, 993 ["When the jurisdictional allegations are based solely on risk to the child, that risk must be shown to exist at the time of the jurisdiction finding"].)  "The juvenile court need not wait until a child is seriously injured to assume jurisdiction if there is evidence that the child is at risk of future harm . . . ."  (*Yolanda L.*, at p. 993.)

"In a challenge to the sufficiency of the evidence to support a jurisdictional finding, the issue is whether there is evidence, contradicted or uncontradicted, to support the finding.  In making that determination, the reviewing court reviews the record in the light most favorable to the challenged order, resolving conflicts in the evidence in favor of that order, and giving the evidence reasonable inferences.  Weighing evidence, assessing credibility, and resolving conflicts in evidence and in the inferences to be

16

drawn from evidence are the domain of the trial court, not the reviewing court." (*In re Alexis E.*, *supra*, 171 Cal.App.4th at pp. 450-451.)

The sum of the evidence in the record regarding Father's purported use of illicit drugs is as follows: When Father and Mother met more than 20 years ago, they used methamphetamine together. Mother never stated she used methamphetamine with Father more recently. Mother said she suspected Father was using methamphetamine, not based on his behavior, but because she found what she determined to be synthetic urine in Aiden's overnight bag at some point in the "recent past." DCFS presented a report indicating Father missed drug tests on May 15, 18, 26, and 27, and July 6 and 7, 2020; he tested negative for drugs on April 15, May 27, June 11, 16, and 22, and July 2, 8, 17, and 24, 2020.[8] There is no indication in the record that Father missed any drug test between July 24, 2020 and the adjudication/disposition hearing on August 17, 2020.

Assuming Father's six missed drug tests count as positive tests for an unidentified substance, this does not show Father *abused* the unidentified substance. No one reported that Father appeared under the influence at any time relevant to these proceedings. Father had at least nine negative drug tests. At the time of the adjudication/disposition hearing, Father had been employed full time as a welder for five years. Father had no criminal history related to drugs. The six missed tests, without

---

[8] As set forth above, this report indicates that Father tested negative for drugs on May 27, 2020, and he was a "no show" for his drug test on the same date (which is one of the missed tests listed in jurisdictional finding b-5).

more, do not support a finding of substance abuse sufficient for dependency jurisdiction.  (See *In re L.C.* (2019) 38 Cal.App.5th 646, 652, 653 [reversal of jurisdictional finding where evidence showed a legal guardian used methamphetamine seven times in nine months, but "no substantial evidence showed he abused it"].)

We reverse jurisdictional finding b-5 because it is not supported by substantial evidence that Father had a substance abuse issue at the time of the jurisdictional hearing.  For the same reasons, we also reverse the portion of the disposition orders requiring Father to participate in a six-month drug and alcohol program.  DCFS did not recommend such a program for Father in the juvenile court, and DCFS does not ask us to affirm this portion of the disposition orders on appeal.  We affirm the portion of the disposition orders requiring Father to submit to random, weekly drug testing.  Father consented to drug testing if there was a reasonable suspicion of drug use.  His missed drug tests and the evidence regarding synthetic urine support the drug testing order.  Even in the absence of a jurisdictional finding regarding substance abuse, a juvenile court may order a parent to submit to drug testing.  " 'The problem that the juvenile court seeks to address [through court-ordered services] need not be described in the sustained section 300 petition.' "  (*In re D.L.* (2018) 22 Cal.App.5th 1142, 1148.)

**DISPOSITION**

Jurisdictional finding b-5 and the portion of the disposition orders requiring Father to participate in a drug and alcohol program are reversed.  In all other respects, including the requirement that Father submit to random, weekly drug testing, the disposition orders are affirmed.

NOT TO BE PUBLISHED

CHANEY, J.

We concur:

ROTHSCHILD, P. J.

BENDIX, J.